## BORDEN v. UNITED STATES.
### No. 49855.

United States Court of Claims.

Dec. 1, 1953.

Edward A. Lipton, New York City, for plaintiff.

Donald D. Webster, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

JONES, Chief Judge.

. This is a suit for salary withheld from plaintiff on account of loss of payroll funds for which defendant claims plaintiff was responsible.

Plaintiff contracted with the Army Exchange Service, European Theater, to serve as senior accountant for a period of two years beginning January 12, 1948. The contract stipulated that the employer might terminate the contract if it regarded the services of the employee as unsatisfactory, and might withhold salary for all claims against employee for fraud, breach of contract or negligence.

The plaintiff was assigned to the Post Exchange at Bremerhaven, Germany, as chief accountant.

The personnel section was charged with the duty of handling the German payroll. In each of the two months prior to the loss in question a suitcase containing the payroll had been deposited over-night in plaintiff's case with the knowledge and consent of the plaintiff.

On the occasion in question the plaintiff, as chief accountant, caused his acting cashier to go with the paymaster of the personnel section to the financial office where they obtained Deutsche Marks in the equivalent of $24,588.64 to be used for payroll purposes. The money was carried to the plaintiff's accounting office on the second floor of the Post Exchange building. After counting the funds, the money was delivered to the personnel officer on the third floor. Richard S. Proctor, personnel manager, had the money counted by the paymaster and gave the plaintiff a receipt for the full amount.

The same day plaintiff was required to attend an official investigation at the staging area of the Bremerhaven Port of Embarkation and was necessarily absent from his office from about 1:00 p.m. to 5:25 p.m., the closing time of the office being 5:30 p.m. At about 4:00 p.m. of that day the paymaster locked the Deutsche Marks in a wooden strongbox and delivered the box from the personnel office to the acting cashier in the plaintiff's office for safekeeping until the next morning. It was deposited in plaintiff's safe, but plaintiff was not advised of the delivery of the box and its deposit in the safe.

Upon his return to his office at 5:25 p.m. the plaintiff witnessed his cashier lock the safe and the door to the cashier's cage, inserted the two keys in an envelope, placed the envelope in the left-hand drawer of his desk and locked the desk. This was customary procedure on the part of the plaintiff.

The safe key was about 5½ inches long. Plaintiff had a conference with the other chiefs, including the general manager, following which a directive was issued which provided that the plaintiff was responsible for the safekeeping of the safe key, and that currency was to be deposited in accordance with existing directives at the earliest possible time. The plaintiff decided that the saf-

est place to keep the key would be in his desk, and, after talking with the chief of security requisitioned through that official new locks for his desk and for his office doors. There is testimony to the effect that this was in accordance with the conference of chiefs held on April 28, 1949.

The building was enclosed by a fence and a military guard was maintained at the gate at all hours of the day and night. It was located within a large compound which was also fenced, with a 24-hour guard at its gate.

Between 5:30 p.m. August 10 and 8:05 August 11, 1949, an unknown person or persons broke into plaintiff's accounting office, forced open the drawer of plaintiff's desk, obtained the keys, opened the cashier's cage and the safe, broke open the wooden box, took out the Deutsche Marks, placed the wooden box back in the safe, locked the safe and the cashier's cage and returned the keys to the envelope in plaintiff's desk drawer.

The major portion of the funds was recovered, concealed in a sack of cement in the attic, but the equivalent of $1,677.14 was never recovered. The commanding general of the Bremerhaven Port of Embarkation appointed a board of officers to investigate. During the investigation the board inspected the plaintiff's office and heard the testimony of 12 witnesses. The board found that plaintiff was negligent in habitually keeping the keys to the cashier's cage and to the safe in his desk. It recommended that the plaintiff, the chief accountant, be held pecuniarily responsible. Accordingly, the amount of the loss was withheld from plaintiff's salary.

The facts are set out more in detail in our findings.

Plaintiff sues to recover the amount thus withheld from his salary. The defendant resists recovery on the ground that plaintiff was negligent, and that the contract of employment provided that salary might be withheld in the event of negligence. Plaintiff denies that he was negligent and the issue is thus drawn.

However, at the threshhold we are met with the plea on the part of the defendant that the United States cannot be sued on a contract of employment between the plaintiff as employee and the Army Exchange Service, European Theater, a nonappropriated funds instrumentality, as employer. The contract was signed Employer, Army Exchange Service, European Theater, by George C. Long, Lt. Colonel, SpS, Chief, Personnel Branch.

As set out in AR 210–50, issued on December 13, 1945, and effective during the period here involved, under the title "Basic Plan for Nonappropriated Funds" it is stipulated that certain revenue producing, welfare and sundry activities are necessary adjuncts to the Army and are designed to supplement activities supplied by the Government from appropriated funds and are designed to contribute to the comfort, pleasure, contentment, and mental and physical improvement of military personnel; the funds are to be dispersed solely for the benefit of military personnel; that such funds are not provided by the Congress; that they are termed nonappropriated funds and are under the control of the Secretary of the Army and Secretary of the Air Force. It is also provided in the Army regulations however, that the activities pertaining thereto are Government instrumentalities and, except as otherwise prescribed by competent authority, are entitled to the immunities and privileges of such instrumentalities. It is further provided that the Army Exchange Service has jurisdiction over them and provides staff supervision of all Army Exchanges and consists of officers and enlisted men and civilian personnel, and that as far as practicable Exchanges will be operated by civilian employees, with army officers in executive control. It is further stipulated in the regulations that Exchange contracts are solely the obligation of the Exchange; that they are not Government contracts and the distinction between Exchange contracts and Government contracts will be observed and clearly indicated at all times. It is further provided by the regulations

that the funds accumulated will be dispersed solely for the benefit of military personnel.

In the case of Standard Oil Co. of California v. Johnson, Treasurer of California, 316 U.S. 481, 484, 62 S.Ct. 1168, 1170, 86 L.Ed. 1611, the Court uses the following language:

> "The commanding officer of an Army Post, subject to the regulations and the commands of his own superior officers, has complete authority to establish and maintain an exchange. He details a post exchange officer to manage its affairs. This officer and the commanding officers of the various company units make up a council which supervises exchange activities. None of these officers receives any compensation other than his regular salary. The object of the exchanges is to provide convenient and reliable sources where soldiers can obtain their ordinary needs at the lowest possible prices. Soldiers, their families, and civilians employed on military posts here and abroad can buy at exchanges. *The Government assumes none of the financial obligations of the exchange.* But government officers, under government regulations, handle and are responsible for all funds of the exchange which are obtained from the companies or detachments composing its membership. Profits, if any, do not go to individuals. They are used to improve the soldiers' mess, to provide various types of recreation, and in general to add to the pleasure and comfort of the troops." [Italics supplied.]

Under the plan of operation these supplies are sold to officers, enlisted men and civilians operating the exchange at a figure slightly above cost and the expenses of operation are paid out of the profits from the operation of the exchange.

In a somewhat similar case, Bleuer v. United States, 117 F.Supp. 509, the District Court of the United States for the Eastern District of South Carolina on December 21, 1950, held that the plaintiff had no cause of action against the United States.

In the recent case of Edelstein v. South Post Officers Club, 118 F.Supp. 40, decided April 5, 1951, the District Court of the United States for the Eastern District of Virginia held that the United States has not waived its sovereign immunity as to contract obligations of the club, and that contracts made by the club are not obligations of the United States but solely liabilities of the club.

See also Kenny v. United States, 62 Ct.Cl. 328. In Kyle v. United States, 46 Ct.Cl. 197, 199, the court in dismissing a suit commented on the post fund as follows:

> "* * * This sum is systematically expended in the betterment of post conditions, such as dish towels, powder for destroying objectionable insects, the establishment of an amusement room, etc., the whole matter being under the strict supervision of the proper military authorities. It is a commendable arrangement, tolerated by military authority for the sole benefit of the men in barracks. The United States Treasury received none of the funds. They are paid out without an appropriation. The auditing thereof is not done at the Treasury, but by the council of administration. The United States is in nowise responsible to officers and enlisted men making contributions to the fund, the transaction being between the persons making the same and the authorities receiving it. The defendants are neither parties to nor privity with the transaction in the sense of legal responsibility to respond in damages for its collection or disbursement."

The instant case presents a strange anomaly. The officers of the army have complete supervision of the post exchange, though in operation civilians are usually employed. The officers serve, however, without pay other than their

regular pay as officers of the United States Army. The Army personnel receives the advantages and benefits of the organization. The activities of the post exchanges and their objectives are so woven into the pattern of the Army and are so closely linked to its major objective that it is difficult to separate the one from the other.

According to some of the decisions, the Exchange Service may not be sued because, being an agency of the Government, it has a privileged status and consent to be sued has not been given. The defendant, however, takes the position that it, the defendant, may not be sued because not a party to the contract. If its position is correct, the citizen is left without a remedy for breach of a contract which he may have with the Army Exchange Service.

Clearly under the decision in Standard Oil Co. v. Johnson, supra, he may not sue the Exchange Service, because consent has not been granted.

May he sue the defendant? He may do so only if the defendant is obligated under an Exchange contract.

The Army officers are given complete supervision of these Post Exchanges. They handle the money. They have control of the funds. The funds are used to make the Army more effective. In other words the officers run the show. The Exchanges are established and maintained for the benefit of Army personnel. That is their major, in fact their sole purpose. Even the civilian employees are subject to the Articles of War.

For the Army to contend and to provide by regulation that it is not liable since it did not act in its official capacity would be like a man charged with extramarital activity pleading that whatever he may have done was done in his individual capacity and not in his capacity as a husband.

This, however, is not primarily a question of the reasonableness of regulations, nor whether the regulations were within the framework of the authorizing statute.

It is a question of liability under a contract signed by a post exchange.

The contracts are actually made by the post exchange and the operating expenses are apparently paid out of profits on the various articles that are supplied by these exchanges, and any surplus funds thus accumulated are used for other activities of the same character or for recreation and are not expended for the maintenance of the Army as such.

It is true that occasionally the Army has furnished facilities for the use of a post exchange, but this would not make it liable for the operative contracts of the exchange. In the instances in which the profits of a post exchange were deposited in the Treasury, they were not placed in the general fund, but in a special fund for the use of other post exchanges.

Paragraph 35(h) (1) of AR 210–65, in effect at the time of the transactions involved herein, is as follows:

"Exchange contracts are solely the obligation of the exchange. They are not Government contracts and the distinction between exchange contracts and Government contracts will be observed and clearly indicated at all times."

█ If this were a case of first impression we might be inclined to hold that the entire activity is so much an integral part of the Army's actual operational structure as to make it a direct agency of the Government, nowithstanding the funds are not ordinarily appropriated for the operation of the exchanges. But in the light of the decision of the Supreme Court cited above, and those of other courts to which we have referred, we reluctantly reach the conclusion that plaintiff cannot sue the United States on a contract of employment which is signed by the Army Exchange Service, European Theater.

█ This disposition makes it unnecessary to pass upon the question of whether the evidence shows that plaintiff was guilty of negligence in connection

with the incident in question. However, in order that the entire case may be disposed of at one time, regardless of what rule of law may be applied, we have found that the facts as disclosed by the record are not sufficient to show negligence on the part of the plaintiff. What should he have done with a key that was 5½ inches long and weighed 5 ounces? It was too big to carry in a pocket. Plaintiff no doubt thought there was graver danger of his living quarters being broken into, or of the key's being lost in carrying it back and forth than if it were kept in a guarded inclosure.

We think it is proper that this situation should be called to the attention of the Congress. It seems fair that either the Post Exchanges or the Government should be subject to suit and liable for any breach of a contract that had been duly signed by the Army Exchange Service.

The petition is dismissed. It is so ordered.

MADDEN and LITTLETON, Judges, concur.

WHITAKER, Judge (concurring in part and dissenting in part).

I agree that under all the circumstances this plaintiff was not guilty of negligence and, therefore, that the amount he claims should not have been deducted from his pay; but I do not agree that he has no right of action to recover it.

The majority recognize that he should have a right of action,[1] but they feel compelled to hold that he has not by the decision of the Supreme Court in Standard Oil Co. v. Johnson, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611, and by previous decisions of our own court and of other courts. I do not feel so compelled.

This man sues on a contract he had with the Army Exchange Service. This Service was established by the Army under Army regulations promulgated under congressional authority; it was run by the Army and for the benefit of the Army. No individual and no organization other than the Army was entitled to any part of its profits; and no individual nor any organization other than the Army exercised any dominion and control over it. All of its activities were under the direction and control of the Army.

Of the status of Army exchanges the Supreme Court in Standard Oil Co. v. Johnson, supra, said, in conclusion:

"From all of this, we conclude that post exchanges as now operated are arms of the government deemed by it essential for the performance of governmental functions. They are integral parts of the War Department, share in fulfilling the duties entrusted to it, and partake of whatever immunities it may have under the constitution and federal statutes. * * *"

The business of the Army Exchange Service is a business of tremendous magnitude; its contracts run into millions of dollars a year, and yet it is said that no contractor has a right of action against it or any one else on any of these contracts.

That just cannot be.

I agree that the Army Exchange Service is not a separate entity capable of suing or being sued. It is a part of the Army, and hence, it is the Army that is liable on contracts entered into by it. But of course the Army is not a separate entity; it is a part of the Government of the United States; and, hence, it is the United States that is liable.

The United States is liable because the contracts of the Army Exchange Service were made for the benefit of the United States. They were made to promote the

---

1. Among other things, the majority opinion says: "For the Army to contend and to provide by regulation that it is not liable since it did not act in its official capacity would be like a man charged with extra-marital activity pleading that whatever he may have done was done in his individual capacity and not in his capacity as a husband."

welfare of the members of its military forces, to improve the Army mess, to contribute to the mental and physical improvement of the military personnel, and to aid in the enforcement of good order and discipline and to increase the efficiency of the Army by providing entertainment and pleasure for its members.

Not only were its contracts made for the benefit of the United States, they were authorized by the Congress of the United States. The Supreme Court in Standard Oil Co. v. Johnson, supra, said:

"On July 25, 1895, the Secretary of War, under authority of Congressional enactments (16 Stat. 315, 319; 18 Stat. 337) promulgated regulations providing for the establishment of post exchanges (G.O. 46, Hdqrs. of the Army). These regulations have since been amended from time to time and the exchange has become a regular feature of Army posts. That the establishment and control of post exchanges have been in accordance with regulations rather than specific statutory directions does not alter their status, for authorized War Department regulations have the force of law (United States v. Eliason, 16 Pet. 291, 302, 10 L.Ed. 968; Gratiot v. United States, 4 How. 80, 117–118, 11 L.Ed. 884).

"*Congressional recognition that the activities of post exchanges are governmental has been frequent. Since 1903 (32 Stat. 927, 938), Congress has repeatedly made substantial appropriations to be expended under the direction of the Secretary of War for construction, equipment, and maintenance of suitable buildings for post exchanges. In 1933 and 1934, Congress ordered certain moneys derived from disbanded exchanges to be handed over to the Federal Treasury* (47 Stat. 1571, 1573; 48 Stat. 1224, 1229, 31 U.S.C.A. §§ 725g to 725k. See Hearings, House, War Department Appropriation Bill, 1934, 72d Cong., 2d Sess., 648). * * *"

The contracts having been made for and on behalf of the United States and under regulations authorized by Congress, how can it be doubted that the United States is liable on them, since long ago Congress authorized suits against the United States on express or implied contracts? (Sec. 1491 of 28 U.S.C.)

The only possible excuse for saying the United States is not liable on these contracts is the following provision in the Army Regulations, AR 210–65, as issued on June 12, 1945:

"Exchange contracts are solely the obligation of the exchange. They are not Government contracts and the distinction between exchange contracts and Government contracts will be observed and clearly indicated at all times. * * * [Army Exchanges, section I, 35 h. (1).]"

Army regulations say exchange contracts are not government contracts, and, yet, the Supreme Court says that exchanges are "arms of the government," as, indeed, it must be said, especially since Congress makes appropriations for their support and maintenance, and exercises control over their funds, as the Supreme Court pointed out in the case cited.

By what authority does the Army say that their contracts are not government contracts? Congress has not authorized it to do so. It authorized it to set up exchanges, but Congress did not authorize it to set aside a prior Act of Congress making the Government liable to suit on its contracts, express or implied. The quoted Army regulation is in derogation of the Act of Congress giving consent to suit on its contracts. It is, therefore, invalid. The Army cannot set aside an Act of Congress.

I must confess that the italicized portion of the quotation from the cited case in the opinion of the majority lends some support to the assertion of validity of the Army regulation, but I point out that the question presented to us here was not present in Standard Oil Co. v. Johnson,

880

supra, where this language was used. The question there was whether or not a post exchange was a department of the Government of the United States. The State of California had levied a tax on gasoline sold to United States Army post exchanges in California. The Supreme Court held that the tax was invalid because the Act made the tax inapplicable to fuel sold to "the government of the United States or any department thereof", and because a post exchange was a department of the Government. The question of the liability of the United States on the contracts of post exchanges was not presented to the Supreme Court in that case.

The italicized portion of the quotation was said only incidentally, in the course of describing the operations of the exchange. The Court did not mean to pass on the question of whether or not the Government was liable on the obligations of the exchange. That is the question with which we are confronted in this case. When that case is presented to the Supreme Court, I am satisfied that it will not hold that the Government is not liable.

The situation today under the Army Exchange Service is not at all comparable with the situation presented to this court in Kyle v. United States, 46 Ct.Cl. 197. Indeed, a post exchange was not there involved at all. What was there involved was a "post or company fund." The opinion shows that the accumulations in this fund arose "principally from an economical administration of post domestic affairs, voluntary contributions, and an inconsequential tax upon the post trader." A great many military organizations, if not all, maintain a company or post fund, which is something entirely separate and distinct from a post exchange. I do not think that case and the one presented to us here are at all comparable.

In the case of Bleuer v. United States, supra, the court had before it an officers' mess. The court's opinion shows Congress had expressly prohibited officers' messes from paying civilian employees out of appropriated funds. In other words, if the officers wanted service over and above what was provided by Congress for their mess, they had to pay for it individually. The court of necessity held that the United States was not liable in that case.

Judge Bryan in Edelstein v. South Post Officers' Club, supra, decided April 25, 1951, in a one-page memorandum opinion, held the United States was immune from suit for obligations of an officers' club. He relied on the Army Regulations, but, as I have pointed out above, I do not think the Army Regulations are controlling.

We all agree somebody owes this plaintiff the money he claims; he worked for it and he is due it. The Army Exchange Service says it cannot be sued, and that is right. If the United States is successful in maintaining its claim that it also cannot be sued, the plaintiff is wholly without a remedy. The money is owing to him, but nobody can be made to pay it. Congress did not mean for this to happen. It said so when it gave its consent to be sued on its contracts.

I respectfully dissent.